UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**2036**

-----------------------------------------------------------------------x

LYNDA KESSELMAN,

      *Plaintiff*,

      *v.*

EMPIRE MERCHANTS, LLC A DIVISION OF
THE CHARMER-SUNBELT GROUP *and*
CHRISTOPHER GIGLIO AKA
CHRIS GIGLIO,

      *Defendants*.

**Index No.:**

**COMPLAINT**

-----------------------------------------------------------------------x

Plaintiff Lynda Kesselman, by and through her attorneys, The Harman Firm, PC, respectfully alleges as follows:

## PARTIES AND NATURE OF ACTION

1.     Plaintiff Lynda Kesselman worked as a Field Sales Manager at Defendant Empire Merchants, LLC, and brings claims for hostile work environment, gender discrimination, and illegal termination.

2.     This action seeks damages for hostile work environment and based upon gender discrimination under the New York City Human Rights Law as codified at N.Y.C. ADMIN. CODE §§ 8-101–31 ("NYCHRL"), because Empire Merchants management and Defendant Giglio interfered with Plaintiff's employment and treated her differently from other male employees.

3.     Plaintiff Lynda Kesselman ("Plaintiff Kesselman" or "Ms. Kesselman") is a citizen of the Township of Union, County of Union, State of New Jersey.

4.     Upon information and belief, at all times relevant hereto, Defendant Empire Merchants, LLC, a Division of The Charmer-Sunbelt Goroup ("Empire Merchants" or

"Company"), is an entity organized and existing under the laws of Delaware with a principal place of business in County of Queens, State of New York, and previously employed Ms. Kesselman.

5.      Upon information and belief, Defendant Christopher Giglio (AKA Chris Giglio) ("Defendant Giglio") is a citizen of the County of Kings, State of New York, and was in a supervisory position over Plaintiff while she was employed by Defendant Empire Merchants.

6.      Upon information and belief, Empire Merchants is a company distributing wines and spirits.

## JURISDICTION AND VENUE

7.      Jurisdiction of this Court is properly laid pursuant to 28 U.S.C. § 1332, in that:

(i)      Plaintiff Kesselman is a citizen of the Township of Union, County of Union, State of New Jersey;

(ii)      Defendant Empire Merchants is a Delaware corporation with its principal place of business in the County of Queens, State of New York;

(iii)      Defendant Giglio is a citizen of the County of Kings, State of New York; and

(iv)      The amount in controversy exceeds the requisite amount of seventy-five thousand dollars ($75,000).

## DEMAND FOR TRIAL BY JURY

8.      Plaintiff respectfully requests a trial by jury.

## STATEMENT OF FACTS

9.      Plaintiff Kesselman worked at Empire Merchants for nearly three and one-half (3.5) years until she was illegally terminated on December 17, 2013.

2

10.     Ms. Kesselman was an excellent employee. In April 2011, she was recruited from another division at Empire Merchants where she was a Sales Representative and promoted to the position of Field Sales Manager. In her position as Field Sales Manager, the bulk of her work took place in Manhattan.

11.     Ms. Kesselman held the position of Field Sales Manager for approximately two and one-half (2.5) years and had five (5) employees directly reporting to her. During this period, Ms. Kesselman reported to Defendant Giglio who is the Division Manager at Defendant Empire Merchants.

12.     Defendant Giglio had thirty-five (35) Sales Representatives and six (6) Field Sales Managers reporting to him: five (5) men and Ms. Kesselman, the only woman.

13.     Defendant Giglio engaged in an ongoing efforts to make her work environment unbearable, essentially he sought to get rid of Ms. Kesselman.

14.     When Ms. Kesselman required input from Defendant Giglio in the capacity as her supervisor, he would simply ignore her requests, which made it nearly impossible at times, for Ms. Kesselman to perform her job. Often he would not acknowledge her presence when she tried to speak with him, as if she did not exist.

15.     During Ms. Kesselman's tenure in the Company, Defendant Giglio made a point to interact with her as little as possible because she was the only female Field Sales Manager reporting to him. This deliberate effort to alienate Ms. Kesselman humiliated her and prevented her from being a full and active member of Defendant Empire Merchant's sales team.

16.     Defendant Giglio never took any interest in Ms. Kesselman's work and made little efforts, if any, to interact with her clients. However, Defendant Giglio spent substantial

time interacting with the five (5) male Field Sales Managers and would often attend their business events and interact with them, causing Ms. Kesselman to feel continuously excluded.

17. As the only female Field Sales Manager reporting to Defendant Giglio, Ms. Kesselman was subjected to a hostile work environment based upon her gender.

18. Ms. Kesselman was a great asset to the Company and was awarded the 2012 bronze level coaching award in spite of the constant discrimination that she endured. Ms. Kesselman always received bonuses. Ms. Kesselman was qualified for the positions she held, had excellent relationships with clients and colleagues, and had extensive work experience within the Company. She was shocked and saddened by her sudden termination.

19. From April 18, 2011 to December 17, 2013, Ms. Kesselman worked in the Spirits Division and observed various incidents evidencing Defendant Empire Merchants' and Defendant Giglio's discrimination against her and other female employees because of their gender.

20. Defendant Empire Merchants has a history of discrimination against female employees. In or about June 2012, Jenn Brown, an Assistant Manager at Defendant Empire Merchants, was terminated one (1) week after her return from maternity leave. Upon information and belief, Julia Glazer and Evelyn Gonzales, both former employees of Defendant Empire Merchants, were terminated because they are female in June 2013 and in December 2013.

21. During the two and one-half (2.5) years that Defendant Giglio supervised Ms. Kesselman, he refused to work with her. Defendant Giglio's failure to participate in Ms. Kesselman's career was humiliating, alienating, and frustrating.

22.     During the two and one-half (2.5) years that Defendant Giglio supervised Ms. Kesselman, Defendant Giglio only once accompanied Ms. Kesselman on a day-visit to her client accounts (approximately three to four hours), ending with a dinner at the last account. This was the only business dinner that Defendant Giglio attended with Ms. Kesselman and one of her client accounts.

23.     During the two and one-half (2.5) years that Defendant Giglio supervised Ms. Kesselman, Defendant Giglio never worked with any of Ms. Kesselman's Sales Representatives. Defendant Giglio attended a single sales call with Ms. Kesselman along with Robert Epstein and Lauren Walker on March 25, 2013.

24.     Defendant Giglio never attended any of Ms. Kesselman's events held at any of her client accounts. By contrast, Defendant Giglio worked regularly with the five (5) other Field Sales Managers, all of whom are men. Ms. Kesselman observed Defendant Giglio making future sales appointments with each of the other five male (5) Field Sales Managers.

25.     Further, on a regular basis, Defendant Giglio went out with each of the five (5) male Field Sales Managers to entertain customers at events, happy hours or business gatherings. Defendant Giglio and the other Field Sales Managers usually reviewed weekly meetings during their Thursday Field Sales Manager meetings in Defendant Giglio's office. Ms. Kesselman routinely was excluded from invitation and was not welcome. This caused Ms. Kesselman to feel humiliated, alienated, and frustrated.

26.     On January 20, 2012, around 5:30 p.m., all the managers were having a meeting in Defendant Giglio's office to discuss business topics that needed to be addressed during a meeting to occur the following Monday, which division heads as well as Defendant Empire Merchants' President, E. Lloyd Sobel, would attend. During this meeting it was discussed that

5

Mr. Sobel should be more present and should visit and walk through the offices more in order to be more visible and more connected to employees at all levels. As part of this discussion, Ms. Kesselman commented, in substance, that this was a good idea as it appeared Mr. Sobel is uncomfortable when he speaks to people. Following this comment, Defendant Giglio told Ms. Kesselman in front of Nicole Bosco, John Montana, Brent Turlington, Alex Herredia and Kevin Doolan "that's because you make him sick." Ms. Kesselman was severely upset and painfully embarrassed over Defendant Giglio's degrading comment.

27.    Often, during working hours, Defendant Giglio would come into the "sales bullpen (staff lounge) and toss around a football with male managers. In or around September 2012, Ms. Kesselman asked to give it a try and Defendant Giglio replied "really, you can't throw you're a girl."

28.    Defendant Giglio's gender animus is well known in the Company. On August 21, 2013, while Ms. Kesselman was having lunch with Sales Representative David Mautone, they discussed Defendant Giglio's stated dissatisfaction with an "account trade" that Ms. Kesselman managed, Mr. Mautone told her "you know, Chris [Defendant Giglio] doesn't treat you the same respect as the other Field Sales Managers, because if you were one of the guys you wouldn't be making a big deal about this."

29.    On October 11, 2013, Defendant Giglio called John Montana and Ms. Kesselman into his office to let them know that some of their accounts were being surveyed and that they should get them in proper order. During this meeting, Lauren Walker, New York State manager for Bacardi USA, a premier, high-profile supplier for the Company was on the speaker phone. Defendant Giglio and Lauren Walker were having an argument. Ms. Walker was not aware that other people were in the room and that Defendant Giglio kept putting her on mute to laugh at

6

her. Observing what transpired in the office against her female Bacardi supplier-partner made Ms. Kesselman quite uncomfortable.

30.     Every Thursday, Ms. Kesselman and the other Field Sales Managers met in Defendant Giglio's office. Before meetings, Defendant Giglio and the five (5) male Field Sales Managers would talk about sports incessantly. In order to join in the conversation, Ms. Kesselman would try to get informed about current sports events. One Thursday in November 2013, Ms. Kesselman attempted to make conversation and commented about a sports event. Defendant Giglio snapped at her in front of her colleagues and said "you should stick to topics you know about like celebrity gossip and the Kardashians."

31.     During the course of Ms. Kesselman's employment at Defendant Empire while Defendant Giglio was her supervisor, on several occasions, including general sales meetings, field sales manager meetings and corporate events, he disparaged Ms. Kesselman, remarking, in substance, "there's that Jersey Jew housewife accent coming out again."

32.     Defendant Giglio also targeted Ms. Kesselman for reprimand for relatively inconsequential incidents that did not cause financial loss to the Company, did not cause a breakdown of client accounts or supplier or vendor relationships, that did not harm anyone at the Company—yet Defendant Giglio trumped them up to "write ups."

33.     For example, in June 2011, two months after Ms. Kesselman began working in her Field Sales Manager position under Defendant Giglio, she took a sick day on a Friday. Defendant Giglio was out-of-state on business for a few days, including that day. Ms. Kesselman diligently notified Defendant Giglio's administrative assistant and his team analyst that she would be out that day, and personally called another sales manager to ask him to cover her team that day. Nonetheless, Defendant Giglio gave her a "write up" for not letting him know

7

directly. When Ms. Kesselman tried to explain that it was an inadvertent "rookie mistake", he would not hear of it.

34.     Similarly, just prior to her termination, on December 10, 2013, Ms. Kesselman emailed Defendant Giglio, indicating that her attempt to drive to her New York City territory was made impossible by the extremely bad, blizzard-like weather and consequential hazardous, impossible driving conditions; she was forced to turn around and return home. Notwithstanding the dangerous driving conditions about which, upon information and belief, Defendant Giglio knew and were all over the news (upon information and belief, public schools and other institutions were closed), Defendant Giglio chastised Ms. Kesselman telling her, in substance, that she could have "handled this much differently," and that he was logging her in for a personal day. Less than one (1) hour later, Ms. Kesselman was told to report for a thirty-minute (30-minute) meeting on at 9:00 a.m. on December 12, 2013 with Human Resources ("HR") Director Annette Perry and Defendant Giglio. Later on that December 10, 2013 day, Ms. Kesselman was told that the HR meeting was rescheduled to 3:00 p.m. on December 12, 2013, for an hour.

35.     During the December 12, 2013 meeting Defendant Giglio told Ms. Kesselman that she was taking advantage of how understanding he was regarding days off. However, in or around December 2012, upon information and belief, Defendant Giglio had the same feeling regarding another male Field Sales Manager, John Montana; however, Defendant Giglio did not require Mr. Montana to attend an HR meeting. Instead, Defendant Giglio handled the situation himself and simply spoke with Mr. Montana. By contrast, Ms. Kesselman was "written up" for the snow-day, even though it was essentially a *force majeure*.

36.     Also during the December 12, 2013 meeting with Defendant Giglio and HR Director Perry, Defendant Giglio berated Ms. Kesselman for an allegedly inaccurate submission

8

by her to the Company that one of her field sales representatives, Anthony Baggio had taken a personal day on that snowy December 10, 2013, when Mr. Baggio later said that he worked that day.  At the meeting, Ms. Kesselman explained that Mr. Baggio had, in fact, texted Ms. Kesselman at 10:26 a.m. on December 10 that the roads were too icy, he was not going to get his territory, he was staying home and would make some calls, that she did not want him to get in trouble for not working that day so she called in a personal day for him (as Defendant Giglio has advised Ms. Kesselman an hour earlier, that he was logging a personal day for her on that snowy day), and that there was no malice or anything underhanded intended—she had inadvertently erred and was sorry.  And, Mr. Baggio, who is 70 years old, had a history of changing his personal days, after the fact, for doctors appointments and the like, *e.g.*, taking a personal day and then changing it after to say that he worked and visa versus.  Nonetheless, she was "written up" and "suspended" for this incident as well, as having had violated company policy.

37.    Those two incidents in December 2013 serve to further underscore Defendant Giglio's *animus* and vendetta against women and how, due to her gender, Ms. Kesselman was required to jump through Defendant Giglio's arbitrary hoops hoping that Ms. Kesselman would just give up and quit.

38.    Ultimately, on December 17, 2013, and following a sham "investigation" of the December 12, 2013 "write-ups," Ms. Kesselman was terminated.

39.    Additionally, considering Ms. Kesselman's substantial accomplishments during her tenure at Defendant Empire Merchants and the independent, objective gratitude she was awarded for such accomplishments, gender discrimination against Ms. Kesselman is the only viable basis for Ms. Kesselman's termination.

## FIRST CLAIM
### Hostile Work Environment based on Gender Discrimination under the NYCHRL against both Defendants

40.     Ms. Kesselman hereby reiterates and incorporates every allegation contained in this Complaint with the same force and effect as though they were separately alleged and reiterated herein.

41.     It is "an unlawful discriminatory practice . . . |f]or an employer or an employee or agent thereof, because of . . . gender . . . of any person . . . to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment." NYCHRL § 8-107(1)–(1)(a).

42.     Defendants discriminated against Ms. Kesselman due to her gender by subjecting her to different standards than her male counterparts, which made it impossible for her to perform her work for them.

43.     Defendants' conduct was outrageous and careless, intended to injure, and done with reckless indifference to Ms. Kesselman's statutorily protected civil rights.

44.     As a direct and proximate consequence of Defendants' gender discrimination, Ms. Kesselman has suffered, and continues to suffer, substantial monetary damages, including, but not limited to, a loss of income, including past and future salary and non-monetary damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

## SECOND CLAIM
### Illegal Termination based on Gender Discrimination under the NYCHRL against both Defendants

45.     Ms. Kesselman hereby reiterates and incorporates every allegation contained in this Complaint with the same force and effect as though they were separately alleged and reiterated herein.

46.     Defendants are in contravention of the NYCHRL because it is "an unlawful discriminatory practice . . . [f]or an employer or an employee or agent thereof, because of . . . gender . . . of any person . . . to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment." NYCHRL § 8-107(1)–(1)(a).

47.     Defendant Empire Merchants "shall be liable for an unlawful discriminatory practice based upon the conduct of an employee . . . where the employee . . . exercised . . . supervisory responsibility." NYCHRL § 8-107(13)(b)–(13)(b)(3).

48.     Defendants terminated Ms. Kesselman due to her gender by subjecting her to different standards than her male counterparts.

49.     Defendants' conduct was outrageous and careless, intended to injure, and done with reckless indifference to Ms. Kesselman's statutorily protected civil rights.

50.     As a direct and proximate consequence of Defendants' termination of Ms. Kesselman's employment, she has suffered, and continues to suffer, substantial monetary damages, including, but not limited to, a loss of income, including past and future salary and non-monetary damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

**WHEREFORE**, Ms. Kesselman, by and through counsel, respectfully requests judgment against Defendants as follows:

i.     On the First Claim, actual damages to be determined at trial, but in no event less than five hundred thousand dollars ($500,000);

ii.     On the Second Claim, actual damages to be determined at trial, but in no event less than five hundred thousand dollars ($500,000)

iii.     Punitive damages;

iv.      Liquidated damages;

v.       Lost wages;

vi.      Lost employment benefits;

vii.     Pre-judgment interest;

viii.    Post-judgment interest;

ix.      Attorneys' fees, disbursements and other costs; and,

x.       Such other and further relief as the Court may deem just and proper.


Dated: New York, New York                    Respectfully submitted by:
       March 31, 2014                               THE HARMAN FIRM, PC

                                                    Walker G. Harman, Jr. [WH-8044]
                                                    Ronnie L. Silverberg [RS-6881]
                                                    1776 Broadway, Suite 2030
                                                    New York, New York 10019
                                                    (212) 425-2600
                                                    wharman@theharmanfirm.com
                                                    rsilverberg@theharmanfirm.com